1

2

3

4

5

6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7

8

9

10

11

12

| | |
|---|---|
| WOLFGANG OLSON, | |
| Plaintiff, | |
| v. | C20-1616 TSZ |
| NORTHWEST MOTORSPORT, INC. and NORTHWEST MOTORSPORT, LLC, | ORDER |
| Defendants. | |

13

14

15

16

17

18

19

THIS MATTER came before the Court on a bench trial on February 26 and 27, 2024. Plaintiff Wolfgang Olson was represented by Eugene N. Bolin, Jr. of the Law Offices of Eugene N. Bolin, Jr., P.S., and Guy W. Beckett of the law firm Berry & Beckett PLLP. Defendants Northwest Motorsport, LLC and Northwest Motorsport, Inc. were represented by Paul S. Smith and Martin J. Pujolar of Forsberg & Umlauf, P.S. All other parties named in the Amended Complaint were dismissed prior to trial. At the conclusion of trial, the Court took the matter under advisement.

20

21

22

23

ORDER - 1

# I. FINDINGS OF FACT

1.     Wolfgang Olson is a resident of Washington.  Pretrial Ord. Admitted Facts ¶ 1 (docket no. 99) (hereinafter "Admitted Facts").

2.     Northwest Motorsport, LLC is a Washington business entity.  *Id.* at ¶ 2.

3.     Northwest Motorsport, Inc. was a Washington business entity.  *Id.* at ¶ 3.

4.     Northwest Motorsport, Inc. converted into Northwest Motorsport, LLC on February 28, 2020.  All assets and liabilities of Northwest Motorsport, Inc. then became the assets and liabilities of Northwest Motorsport, LLC.

5.     Wolfgang Olson purchased a 2001 Dodge Ram 3500 (the "truck" or "Ram 3500") from Northwest Motorsport, Inc. on November 1, 2017.  *Id.* at ¶ 4.  The Ram 3500's Vehicle Identification Number ("VIN") is 1B7MF33661J270699.  *See, e.g.*, Vehicle Buyer's Order, Trial Ex. 12.

6.     A vehicle's powertrain consists of its engine, transmission, clutch, driveshaft, axles, and differential.  Cowland Decl. at ¶ 33, Trial Ex. 75.

7.     Emission control systems in passenger cars and trucks in the United States are considered by the United States Environmental Protection Agency and the California Air Resources Board to include all or most of the following components: air system controls; catalytic converters; diesel particulate filters; distributor and distributor components; electronic fuel injection system and injectors; evaporative-emission canister and controls; exhaust manifold; exhaust gas recirculation valve and control system; exhaust pipes (between exhaust manifold and catalyst); fuel cap and tank assembly; pump and fuel lines; ignition coil and ignition module; intake manifold; on-board diagnostic-system

components; oxygen sensors; positive crankcase-ventilation valve; powertrain control

module, including its software and calibration; secondary ignition wires; spark plugs;

throttle body; transmission-control module, including its software and calibration; urea

injection system; vacuum hoses, clamps, fittings, and the tubing used for these

components; and the vacuum temperature, altitude, speed, time-sensitive valves, sensors,

and switches used in the aforementioned components and systems. *Id.* at ¶ 31.

8.     Tampering is the act of making modifications to a vehicle's emissions control

system.  A vehicle that has had any type of modification made to its emissions control

system is considered to have been tampered.  Schaplow Decl. at ¶ 4, Trial Ex. 74.

9.     Tampering can cause a significant increase in a vehicle's pollutant emissions and

increased wear on a vehicle's powertrain components.  Cowland Decl. at ¶ 22–23, Trial

Ex. 75.  Tampered vehicles have a reduced resale value compared to untampered

vehicles.  *Id.* at ¶ 26.  It is illegal to license tampered vehicles for on-road use in several

states.  *See* St. Denis Decl. at ¶ 29, Trial Ex. 76; Cowland Decl. at ¶ 25, Trial Ex. 75.

10.    Prior to the Ram 3500's sale to Plaintiff, Defendants inspected the truck.  Their

inspection revealed that the truck had a tampered turbocharger and had a tuner installed.

Defendants replaced the truck's air filter and they were aware that the truck had a

tampered airbox.  Defendants' inspection also revealed that the Ram 3500 needed new

brakes.  Defendants repaired the truck's brakes but did not address the tampered

emissions control components.  Northwest Motorsport Pre-Sale Repairs, Trial Ex. 10.

11.    Plaintiff initially viewed advertisements for the Ram 3500 on Facebook

Marketplace and on Northwest Motorsport, Inc.'s website.

12.     On October 31, 2017, Plaintiff visited the Defendants' dealership in Lynnwood, Washington after dark and looked at the Ram 3500.

13.     Plaintiff took the Ram 3500 for a test drive of three or four miles and did not notice any problems in the operation of the truck.

14.     Plaintiff was assisted in his viewing of the Ram 3500 by one of Defendants' salespeople.  The salesperson accompanied Plaintiff on his test drive of the truck.

15.     During the test drive, Plaintiff noticed a red device on the seat of the Ram 3500.  Defendants' salesperson told Plaintiff that the device would cause the Ram 3500 to "produce more power" and that the device was easy to use.  Defendants' salesperson said nothing else about the device.

16.     The device was a Superchips tuner.  *See* Superchips Tuner, Trial Ex. 98.

17.     A tuner is used to alter the fuel mapping and defeat emissions controls in a vehicle's main computer, Schaplow Decl. at ¶ 11, Trial Ex. 74, which is known as an electronic control unit, electronic control module, or powertrain control module.

18.     After the test drive, Plaintiff decided to buy the Ram 3500 because he liked the appearance and condition of the truck.

19.     Plaintiff negotiated the price with Defendants' salesperson.  Plaintiff also completed some paperwork with Defendants' sales manager, Bill Primo.  Because Plaintiff did not have some of the necessary documentation, he had to return to the dealership the next day to complete his purchase of the Ram 3500.

20.     When he returned to Defendants' dealership on November 1, 2017, Plaintiff signed several documents.  These documents included a "Retail Installment Sale

Contract," Trial Ex. 11, a "Vehicle Buyer's Order," Trial Ex. 12, a "Northwest

Motorsport *Additional Disclaimers*," Trial Ex. 18, an "Implied Warranty Negotiation

Statement," Trial Ex. 19, a "Notice of Customization Compliance," Trial Ex. 20, and an

"'AS IS' Dealer Warranty Disclaimer," Trial Ex. 21.

21.     The "Vehicle Buyer's Order" contains a prevailing party attorney's fees shifting

provision and a limitation on any damages Plaintiff could recover in litigation arising

from the "Vehicle Buyer's Order."  Vehicle Buyer's Order at ¶ 22, Trial Ex. 12.

22.     The "Northwest Motorsport *Additional Disclaimers*" notified Plaintiff that

vehicles sold by Defendants may have been customized or modified, that any vehicles

with modifications would have to be maintained in accordance with the modification

manufacturer's requirements, and that regardless of any modifications present on the

vehicle at the time of purchase, it was the purchaser's responsibility to ensure compliance

with any applicable state or federal regulations.  The document was not limited to exhaust

systems, emissions controls, or powertrain modifications, and instead contemplated

nearly any type of modification that could be done to a vehicle.

23.     The "Notice of Customization Compliance" alerted Plaintiff to his responsibility

to ensure the Ram 3500 complied with any applicable regulations.  The "Notice of

Customization Compliance" also included a guarantee that Defendants would bring the

Ram 3500 into compliance with any applicable regulations at no cost to Plaintiff so long

as Plaintiff made such a request within thirty days of the vehicle's purchase.

24.     The "'AS IS' Dealer Warranty Disclaimer" indicated that the Ram 3500 was

purchased without any express or implied warranties.

25.     None of the documents signed by Plaintiff explicitly outlined what modifications had actually been made to the Ram 3500.  Nor did any of the documents signed by Plaintiff notify him that the Ram 3500 did not actually comply with state and federal regulations or alert him to any other consequences of the modifications.  All documents signed by Plaintiff were generic in nature.

26.     Defendants sold Plaintiff a service contract with Auto Services Company, Inc. ("ASC") for the Ram 3500.  ASC Warranty Vehicle Protection Plan Signed by Plaintiff, Trial Ex. 15; Complete Copy of ASC Warranty Vehicle Protection Plan, Trial Ex. 16. The service contract identified specified automotive components that it covered and also included certain exclusions from coverage.  *Id.*  One of these exclusions from coverage was for any component failures that were the result of modifications not approved by the original vehicle manufacturer.  *See* Complete Copy of ASC Warranty Vehicle Protection Plan, Trial Ex. 16 at 110.  The Superchips tuner, aftermarket airbox, and aftermarket turbocharger were modifications that were not approved by the Ram 3500's original equipment manufacturer.

27.     Defendants knew but did not disclose to Plaintiff prior to his purchase of the Ram 3500 that the tampering actually done to the truck could potentially preclude the truck from being covered under the service contract Defendants sold to Plaintiff.  Plaintiff never requested coverage under the ASC service contract.

28.     Because Plaintiff purchased a service contract for the Ram 3500, the implied warranty of merchantability was revived.  *See* Vehicle Buyer's Order, Trial Ex. 12; Buyers Guide, Trial Ex. 13.

29.     Including the $3,999 for the service contract, ASC Warranty Vehicle Protection Plan Signed by Plaintiff, Trial Ex. 15, Plaintiff paid $38,323.60 for the Ram 3500, Retail Installment Sale Contract, Trial Ex. 11.

30.     The odometer reading on the Ram 3500 at the time Plaintiff purchased it was 101,972 miles. *Id.*

31.     The odometer reading on the Ram 3500 at the time of trial was approximately 145,000 miles.

32.     At the time of sale, the Ram 3500's vehicle emission control information ("VECI") sticker had been removed and the VIN found in the truck's powertrain control module did not match the truck's stock VIN.  Additionally, the Ram 3500 had a Superchips tuner, an aftermarket airbox, and an aftermarket turbocharger installed.  Each of these modifications is evidence of and constitutes tampering.  Schaplow Decl. at ¶¶ 18–24, Trial Ex. 74.

33.     Neither Defendants' salesperson nor Mr. Primo disclosed to Plaintiff that the Ram 3500 had a tampered emissions system, that the tampered emissions system meant that the truck could not legally be licensed in several states, or that the tampered emissions system could reduce the lifespan of the truck and the truck's value.  Defendants knew but did not disclose to Plaintiff that the Ram 3500 had a tampered airbox, tampered turbo charger, and was missing its VECI sticker.

34.     Defendants' salesperson did disclose the existence of the Superchips tuner to Plaintiff.  This disclosure, however, was incomplete.  The salesperson only told Plaintiff that the Superchips tuner would cause the Ram 3500 to "produce more power" and that

1   the Superchips tuner was easy to use.  What Plaintiff was not told was that the Superchips

2   tuner's software would cause greater wear on the Ram 3500's powertrain, would cause

3   the truck to not conform to state and federal emissions regulations, and could potentially

4   prevent the truck from being licensed in numerous states.

5   35.     Plaintiff testified that, had he been told the full extent of the consequences of the

6   Ram 3500's modifications, he would not have purchased the truck.

7   36.     Prior to buying the Ram 3500, Plaintiff did not know what a tuner was, what a

8   tuner does, or how a tuner works.

9   37.     During his ownership of the Ram 3500, Plaintiff plugged the Superchips tuner into

10  a receptacle under the truck's dashboard to see how the Superchips tuner worked.

11  Plaintiff did not operate or use the Superchips tuner in any way beyond this and

12  otherwise kept it in the truck's glove box.

13  38.     Soon after Plaintiff purchased the Ram 3500, it started developing various

14  mechanical problems.  Among these problems was a "lurching," which was described by

15  Plaintiff as a pulsating acceleration and deceleration which caused him to be thrown back

16  and forth in his seat.

17  39.     Eventually the "lurching" got so bad that Plaintiff had to park the truck until he

18  had saved enough money to take it to a mechanic.

19  40.     After the Ram 3500 had been parked for approximately a month, Plaintiff took it

20  to K.C. Martin Transmissions.

21

22

23

41.    K.C. Martin kept the Ram 3500 for approximately one day.  In that time, they replaced a bell crank/throttle position sensor assembly.  *See* K.C. Martin Transmissions Repair Order, Trial Ex. 94.

42.    The K.C. Martin repair resolved the "lurching" issue.  Plaintiff, however, continued to experience other issues with the Ram 3500.  At trial Plaintiff testified that the truck's engine "bogs down" in certain circumstances and that the truck feels "loose" to the point where he feels like he does not have complete control of the truck.

43.    The Ram 3500 failed an emissions control test at Applus Technologies, Inc. on October 22, 2018.  Oct. 22, 2018, Applus Technologies Inc. Emissions Test Receipt, Trial Ex. 95.  The truck's exhaust opacity measured at 99.9 percent when the maximum allowable opacity was 30 percent.  *Id.*  Plaintiff subsequently took the truck to Gateway Auto Repair to see if the emissions issue could be repaired.  Gateway Auto Repair Statement, Trial Ex. 97.  Gateway Auto Repair was unable to repair the emissions control issue and the truck failed a second emissions test.  *See* Oct. 25, 2018, Applus Technologies Inc. Emissions Test Receipt, Trial Ex. 96.  After the Ram 3500 failed the second emissions test, Plaintiff was able obtain a waiver from the emissions requirements.

44.    Plaintiff has been able to license the Ram 3500 every year he has owned it and continues to drive the truck.

## II. CONCLUSIONS OF LAW

1.      Any Conclusion of Law denominated as a Finding of Fact shall be deemed a Conclusion of Law and any Finding of Fact denominated as a Conclusion of Law shall be deemed a Finding of Fact.

2.      The Court has jurisdiction under 28 U.S.C. § 1332(d).

3.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the events giving rise to this case occurred in this District.

4.      Use of the Superchips tuner on the Ram 3500 constitutes tampering.

5.      Plaintiff has established a violation of the Washington Consumer Protection Act ("CPA").  The CPA makes illegal "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  RCW 19.86.020.  To prove a violation of the CPA, Plaintiff must establish an (1) unfair or deceptive act or practice (2) occurring in trade or commerce, (3) with a public interest impact, (4) that he suffered an injury to his business or property, and (5) and that the unfair or deceptive act caused his injury.  *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 780, 719 P.2d 531 (1986).

6.      Defendants conceded at trial and the Court independently concludes that the public interest element is satisfied in this case.

7.      Selling used vehicles to the general public is an act or practice that occurs in trade or commerce.

8.      Plaintiff can establish a CPA violation by establishing a per se violation. *Hangman Ridge*, 105 Wn.2d at 786.  A per se CPA violation occurs "when a statute

1  which has been declared by the Legislature to constitute an unfair or deceptive act in

2  trade or commerce has been violated." *Id.*

3  9.      A violation of the Auto Dealers Act constitutes a per se breach of the CPA.  *See*

4  RCW 46.70.310.

5  10.     Plaintiff cannot maintain a stand-alone Auto Dealers Act claim because of the

6  statute of limitations.  Notwithstanding the statute of limitations, evidence of a violation

7  of the Auto Dealers Act can be admitted to establish a per se violation of the CPA.

8  *Hoffman v. Transworld Sys., Inc.*, 806 F. App'x 549, 552 (9th Cir. 2020) ("Therefore,

9  even though the Plaintiffs' FDCPA claims have become 'stale,' the Plaintiffs' per se CPA

10 claims based on violations of the FDCPA are governed by the CPA's four-year statute of

11 limitations, and are not time-barred." (citations omitted)); *In re Bryce*, 491 B.R. 157,

12 184–85 (Bankr. W.D. Wash. 2013); *cf. Walker v. Wenatchee Valley Truck & Auto Outlet,*

13 *Inc.*, 155 Wn. App. 199, 208–10, 229 P.3d 871 (2010) (concluding that the Auto Dealers

14 Act does not supersede the CPA and that claims under either act are governed by that

15 act's statute of limitations).

16 11.     The Auto Dealers Act bars a car dealer from, *inter alia*, making "caus[ing] or

17 permit[ing] to be advertised, printed, displayed, published, distributed, broadcasted,

18 televised, or disseminated in any manner whatsoever, any statement or representation

19 with regard to the sale, lease, or financing of a vehicle which is false, deceptive, or

20 misleading."  RCW 46.70.180.

21 12.     Washington courts have interpreted the use of "disseminate" in the Auto Dealers

22 Act to mean "to scatter far and wide; promulgate widely."  *Henery v. Robinson*,

23

1   67 Wn. App. 277, 290, 834 P.2d 1091 (1992) (citation omitted), *review denied by*,

2   120 Wn.2d 1024, 844 P.2d 1018 (1993), *abrogated on other grounds by*, *Klem v. Wash.*

3   *Mut. Bank*, 176 Wn.2d 771, 295 P.3d 1179 (2013).

4   13.   The only evidence admitted at trial addressing the contents of any advertising for

5   the Ram 3500 was a screenshot of a Craigslist advertisement for the truck prior to its

6   acquisition by Defendants.  *See* Screenshot of Craigslist Advertisement, Trial Ex. 5.  No

7   other evidence at trial addressed the contents of any of Defendants' advertisements for

8   the Ram 3500.

9   14.   Plaintiff has not established that Defendants advertised or disseminated any false,

10   misleading, or deceptive information about the Ram 3500.

11   15.    Because Plaintiff did not establish a violation of the Auto Dealers Act, Plaintiff

12   has not shown a per se violation of the CPA.

13   16.   Beyond showing a per se violation, Plaintiff can also prove a CPA violation by

14   establishing "an act or practice that has the capacity to deceive substantial portions of the

15   public, or an unfair or deceptive act or practice not regulated by statute but in violation of

16   public interest."  *Klem*, 176 Wn.2d at 787.

17   17.   Proving that an act or practice was deceptive requires Plaintiff to show only "that

18   the alleged act had the *capacity* to deceive a substantial portion of the public."  *Hangman*

19   *Ridge*, 105 Wn.2d at 785 (citations omitted) (emphasis in original).  The capacity to

20   deceive "exists if there is a representation, omission or practice that is likely to mislead a

21   reasonable consumer."  *Panag v. Farmers Ins. Co. of Wash.*, 166 Wn.2d 27, 50,

22   204 P.3d 885 (2009) (quotation omitted).  Showing intent to deceive is not required.

23

ORDER - 12

*Hangman Ridge*, 105 Wn.2d at 785.  "The purpose of the capacity-to-deceive test is to deter deceptive conduct *before* injury occurs."  *Id.* (emphasis in original).  Omitting facts in the sale of goods is deceptive if the omitted facts "adversely affect[] the property" and "the facts are known to the seller but not easily discoverable by the buyer."  *Griffith v. Centex Real Est. Corp.*, 93 Wn. App. 202, 214–15, 969 P.2d 486 (1998) (citing *Testo v. Russ Dunmire Oldsmobile, Inc.*, 16 Wn. App. 39, 51, 554 P.2d 349 (1976)); *accord Cole v. Keystone RV Co.*, No. 21-35701, 2022 WL 4234958, at *1 (9th Cir. Sep. 14, 2022).  Because the CPA is intended to deter deceptive acts, "a plaintiff need not show that they—or anyone—were in fact deceived."  *See Young v. Toyota Motor Sales, U.S.A.*, 196 Wn.2d 310, 317, 472 P.3d 990 (2020) (citations omitted).

18.     The Court concludes that the extent of the emissions system tampering was information material to the purchase of the Ram 3500.

19.     The Court concludes that the failure to disclose the full extent of the emissions system tampering to the Ram 3500 and the full extent of the tampering's consequences to Plaintiff during the sale of the truck was a deceptive or unfair act or practice.  Based on the information presented to Plaintiff, a reasonable consumer would not have known the full extent of the tampering done to the Ram 3500 or the consequences of that tampering.

20.     When bringing a CPA claim, "[t]he injury involved need not be great, but it must be established."  *Hangman Ridge*, 105 Wn.2d at 792.  A CPA "injury is distinct from damages," and therefore, "[m]onetary damages need not be proved; unquantifiable damages may suffice."  *Panag*, 166 Wn.2d at 57 (quotation and citations omitted).  For example, a plaintiff who alleged that a car dealership sold him a defective vehicle

1    established a CPA injury by showing "that he was inconvenienced, deprived of the use

2    and enjoyment of his property, and received an automobile with defects needing repair."

3    *Tallmadge v. Aurora Chrysler Plymouth, Inc.*, 25 Wn. App. 90, 93–94, 605 P.2d 1275

4    (1979).  CPA injury cannot, however, be based solely on the cost of bringing a CPA

5    action.  *Panag*, 166 Wn.2d at 62.

6    21.    The Ram 3500 failed an emissions test in October 2018.  *See* Oct. 22, 2018,

7    Applus Technologies Inc. Emissions Test Receipt, Trial Ex. 95.  Because of this failed

8    emissions test, Plaintiff had to pay Gateway Auto Repair $182 in an attempt to repair the

9    truck's emissions systems.  *See* Gateway Auto Repair Statement, Trial Ex. 97.  Plaintiff's

10   experts testified that the Ram 3500's modifications reduced the durability and lifetime of

11   the truck's powertrain and reduced the truck's resale value.  Additionally, Plaintiff

12   purchased the service contract without knowing that the tampering might preclude

13   coverage for the Ram 3500.

14   22.    The Court concludes that Plaintiff has suffered both an "injury" and actual

15   damages for purposes of his CPA claim.

16   23.    CPA causation is a proximate cause standard.  *Indoor Billboard/Washington, Inc.*

17   *v. Integra Telecom of Wash., Inc.*, 162 Wn.2d 59, 83, 170 P.3d 10 (2007).  Plaintiff does

18   not need to show that he relied on the unfair or deceptive act to establish proximate

19   cause.  *See Panag*, 166 Wn.2d at 63–64.  To prove causation, Plaintiff "must establish

20   that, but for the defendant's unfair or deceptive practice, the plaintiff would not have

21   suffered an injury."  *Indoor Billboard*, 162 Wn.2d at 83.  When, as here, the deceptive or

22   unfair act complained of is an omission of material fact, Washington courts recognize a

23

rebuttable presumption that a plaintiff has relied on omitted material facts to establish causation in a CPA claim. *See Deegan v. Windermere Real Estate/Center-Isle, Inc.*, 197 Wn. App. 875, 886, 890, 391 P.3d 582 (2017). This presumption may be overcome by showing "that the plaintiff's decision would have been unaffected even if the omitted fact had been disclosed." *Morris v. Int'l Yogurt Co.*, 107 Wn.2d 314, 329, 729 P.2d 33 (1986).

24.     The evidence shows that but for Defendants' deceptive act, Plaintiff would not have been injured. The Court concludes that Plaintiff has established the causation element of his CPA claim.

25.     The CPA "shall be liberally construed that its beneficial purposes may be served." RCW 19.86.920. In service of that goal, Washington courts have recognized that provisions in contracts that limit liability or damages violate public policy to the extent such provisions would undermine a plaintiff's CPA claim. *See Riley v. Iron Gate Self Storage*, 198 Wn. App. 692, 708–09, 395 P.3d 1059 (2017).

26.     Under Washington law, "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." RCW 62A.2-314(1).

27.     Merchantability is defined, at a minimum, to require that a good, *inter alia*, "pass without objection in the trade under the contract description" and be "fit for the ordinary purposes for which such goods are used." *Id.* at 62A.2-314(2).

28.      A good's merchantability is generally evaluated using a reasonableness standard. *Fed. Signal Corp. v. Safety Factors, Inc.*, 125 Wn.2d 413, 426, 886 P.2d 172 (1994).

1  "The term merchantable is not synonymous with perfect, and the question of whether a

2  good is merchantable depends on the particular facts of the case." *Tallmadge*,

3  25 Wn. App. at 94 (citations omitted).

4  29.    A vehicle will generally be merchantable if it "conforms to the quality of other

5  brands in the marketplace" or is "reasonably safe when put to [its] ordinary use and

6  reasonably capable of performing [its] ordinary functions." *Fed. Signal*,

7  125 Wn.2d at 427.  "Factors such as the usage in the trade, the price actually paid as

8  compared to the standard price, the characteristics of similar goods manufactured by

9  others, and government standards and regulations regarding such a good are

10  considerations when evaluating merchantability." *Id.*

11  30.    The Ram 3500 was approximately sixteen years old and had 103,000 miles on it

12  when Plaintiff bought the truck.

13  31.    Plaintiff testified that the Ram 3500 has continued to have mechanical issues, but

14  he also testified that he has been able to drive the truck on a regular basis.  Plaintiff

15  further testified that, beyond the K.C. Martin repair and routine maintenance, he has had

16  no other work done to the Ram 3500.

17  32.    Merchantability does not require perfection; a vehicle can still be merchantable

18  even if it has repairable defects.  *Tallmadge*, 25 Wn. App at 94; *see also Jet Boats v.*

19  *Puget Sound Nat'l Bank*, 44 Wn. App. 32, 43, 721 P.2d 18 (1986) (concluding that sale of

20  a fishing vessel that was delivered with numerous defects but was of "fair average

21  quality" did not constitute a breach of the implied warranty of merchantability).

22  33.    The Ram 3500 is still able to be routinely driven despite Plaintiff's complaints.

23

34.    Plaintiff has failed to prove a breach of the implied warranty of merchantability claim.  This claim is dismissed.

35.    Plaintiff's breach of contract claim revolves solely around the duty of good faith and fair dealing.  *See* Am. Compl. at ¶¶ 7.3–7.5 (docket no. 5).

36.    Washington law recognizes that every contract is subject to an implied duty of good faith and fair dealing.  *Rekhter v. Dep't of Soc. & Health Servs.*, 180 Wn.2d 102, 112, 323 P.3d 1036 (2014).  The duty of good faith and fair dealing is limited to the terms of the contract agreed to by the parties and "cannot add or contradict express contract terms and does not impose a free-floating obligation of good faith on the parties."  *Id.* at 113.  During contract negotiations, however, the duty of good faith and fair dealing includes a duty to disclose material information relevant to the subject of the contract.  *Liebergesell v. Evans*, 93 Wn.2d 881, 891–94, 613 P.2d 1170 (1980); *accord Landstar Inway, Inc. v. Samrow*, 181 Wn. App. 109, 124, 325 P.3d 327 (2014).

37.    The relevant contractual documents are the "Retail Installment Sale Contract," Trial Ex. 11, the "Vehicle Buyer's Order," Trial Ex. 12, the "Northwest Motorsport *Additional Disclaimers*," Trial Ex. 18, the "Implied Warranty Negotiation Statement," Trial Ex. 19, the "Notice of Customization Compliance," Trial Ex. 20, and the "'AS IS' Dealer Warranty Disclaimer," Trial Ex. 21.

38.    The tampered turbocharger, tampered airbox, and lack of VECI sticker constitute material information relevant to the contract between Plaintiff and Defendants.

39.    Defendants did not disclose this material information to Plaintiff prior to his purchase of the Ram 3500.

40.     Plaintiff has proven his breach of contract claim.

41.     Plaintiff is entitled to damages for his breach of contract claim in the same amount as for his CPA claim.

42.     "In order to recover on a claim of negligence, a plaintiff 'must show (1) the existence of a duty to the plaintiff, (2) a breach of that duty, (3) a resulting injury, and (4) the breach as the proximate cause of the injury.'" *Lowman v. Wilbur*, 178 Wn.2d 165, 169, 309 P.3d 387 (2013) (citation omitted).  Plaintiff alleges that Defendants were negligent because they either negligently failed to inspect the truck prior to and after the sale and/or because Defendants' employees failed to make certain disclosures to Plaintiff prior to the truck's sale.  *See* Am. Compl. at ¶ 7.3 (docket no. 5).

43.     "The existence and scope of a duty are questions of law." *Wuthrich v. King Cnty.*, 185 Wn.2d 19, 25, 366 P.3d 926 (2016) (citation omitted).  In Washington, a used car dealer does not have a duty to "dismantle the [vehicle] or make a factory type inspection." *Burnett v. Hunt*, 5 Wn. App. 385, 392, 486 P.2d 1129 (1971).  A used car dealer is, however, "required to exercise reasonable care to ascertain patent defects which are dangerous to human life and which he could discover by reasonable care." *Id.*

44.     Regarding disclosure, if a dangerous condition is known or should be known to a used car dealer, the dealer must "exercise reasonable care to inform the purchaser of such dangerous condition." *Id.* at 391.

45.     Plaintiff has produced no evidence showing that the Ram 3500 was dangerous or suffered from any defects that were dangerous to human life.  He did testify that, after he purchased the truck and put several thousand miles on it, the Ram 3500 started shaking

when driving down the road and felt "loose," or like it was driving itself.  Plaintiff also testified, however, that he test drove the Ram 3500 prior to purchase, and that he was satisfied with the truck's handling.  Moreover, Defendants undertook a presale safety inspection of the Ram 3500 and repaired the truck's brakes.

46.     The evidence presented at trial is insufficient to show that, prior to sale, Defendants knew or should have known that the Ram 3500 had a dangerous condition.

47.     Because Plaintiff has failed to show Defendants breached a duty owed to him, Plaintiff's negligence claim is dismissed.

48.     Because Plaintiff has secured a verdict against Defendants for his CPA and breach of contract claims, the Court finds that Defendants are not the prevailing party for purposes of the shifting of attorney's fees under the "Vehicle Buyer's Order."  *See Scoccolo Const., Inc. ex rel. Curb One, Inc. v. City of Renton*, 158 Wn.2d 506, 521, 145 P.3d 371 (2006).

49.     The Court finds that Plaintiff is entitled to the cost of the Auto Services Company, Inc. service contract, $3,999, and the cost of the Gateway Auto Repair emissions repairs, $182, as damages.  Plaintiff has failed to prove by a preponderance of the evidence his remaining claims for damages.  The Court further finds that trebling of the CPA damages is not warranted in this case.  *See* RCW 19.86.090 (awarding of treble CPA damages done at the Court's discretion).

50.     The Court finds that Plaintiff is entitled to his reasonable attorney's fees under RCW 19.86.090 and as the prevailing party on his breach of contract claim.

51.     Because Defendants failed to present evidence distinguishing between Northwest Motorsport, Inc. and Northwest Motorsport, LLC, the Court finds that entry of judgment is appropriate against both entities.

### III. Conclusion

Based on the above Findings of Fact and Conclusions of Law, the Court ORDERS:

(1)     Plaintiff has proven his Washington Consumer Protection Act claim and his breach of contract claim against both Northwest Motorsport, Inc. and Northwest Motorsport, LLC.

(2)     Plaintiff's breach of implied warranty of merchantability and negligence claims are DISMISSED.

(3)     Plaintiff is AWARDED $3,999 in damages for his purchase of the ASC service contract and $182 dollars for the Gateway Auto Repair emissions repairs, for a total of $4,181 in damages.  The Court exercises its discretion and will not award treble CPA damages under the facts and circumstances of this case.

//

//

//

//

//

//

//

ORDER - 20

1   (4)  Plaintiff is ENTITLED to his reasonable attorney's fees in bringing this

2 action and shall file any motion within fourteen (14) days and note the motion pursuant to

3 Local Civil Rule 7(d)(3).

4   (5)  The Clerk is DIRECTED to enter judgment consistent with this Order.

5   (6)  The Clerk is DIRECTED to send a copy of this Order to all counsel of

6 record.

7   IT IS SO ORDERED.

8   Dated this 13th day of March, 2024.

9

10                 Thomas S. Zilly

11                 United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23